hYELVERTON, Judge.
Harry Broussard appeals the Administrative Hearing Officer’s dismissal of his workers’ compensation claim against his employer, Dacon Corporation (Dacon). For the reasons below, we conclude that the hearing *1326 officer erred in the denial of benefits for Broussard’s work-related heart condition; thus, we reverse .the judgment dismissing Broussard’s claim. We also conclude that Broussard is entitled to penalties and attorney fees.
IzFACTS
Dacon had hired Broussard as a journeyman/electrician to assist in building a switch gear yard at Dacon’s Refinery. Several weeks before the injury in question, Dacon had transferred Broussard from its refinery to its Conoco Marine facility requiring Broussard to dig ditches and lay piping in the ditches. On the morning of September 25, 1995, Broussard arrived at the Conoco Marine facility, worked for an hour leveling a ditch, and then proceeded to cut pipes. At around 10:00 a.m., Broussard began to feel dizzy. He rested for a while in an air-conditioned shack. Later that same day, the foreman drove Broussard to the emergency room where he was diagnosed with atrial fibrillation, a type of heart arrhythmia. The record reflects that Broussard had never suffered from atrial fibrillation before this incident, nor had he ever been treated for any kind of heart problems. Due to this illness, Broussard was hospitalized until September 30,1995 and excused from work for seven weeks. Broussard’s doctor gave him a full duty release to work on November 13, 1995.
Broussard filed a “Disputed Claim for Compensation” form with the Office of Workers’ Compensation seeking payment of benefits and medical expenses. He also alleged that Dacon’s refusal to pay was arbitrary and capricious entitling him to penalties and attorney fees.
At the beginning of the hearing, the parties stipulated that Broussard was in the course and scope of his employment on the date in question. Additionally, they stipulated that, if the injury was found to be compensable, the length of disability was seven weeks and the total indemnity would be $2,310. They submitted the medical 13biHs totaling $9,023.73 as a joint exhibit, but with the stipulation that they be subject to the fee schedule.
Broussard testified at the hearing regarding the working conditions during the two weeks preceding the illness and on the date of the incident. For the two weeks before the incident, Broussard asserted that he essentially dug ditches in the sun, without any shade, using a shovel. He did this job four days a week, ten hours a day. He further explained that while working in the ditches he was required to wear a nomex fire-resistant suit for safety reasons. Although lightweight, this suit according to Broussard was hot. The evidence established that the weather was hot in the days preceding the illness, with highs between 92 and 96 degrees. Broussard testified that due to the heat and the nomex suit, he was always sweating.
Broussard admitted that a baekhoe initially dug the ditches that were four feet wide and six to eight feet deep. However, he explained that “you have to get inside [the ditch] and level it where your pipes are going to come up through the floor.” He testified that, even with the help of the baekhoe, “sometimes the baekhoe cannot get in there and dig a good square backing on it, so you have to get in there and dig it,” or sometimes the ditches caved-in so that he had to “get in there and clean the ditch out.” Broussard testified that, in his 16 years employed as an electrician, no employer, before or after Da-con, had ever required him to dig ditches, and he knew of no employer ever requiring any electrician to dig ditches, as it is a laborer’s job.
Broussard stated that the date of the illness, September 25, 1995, occurred on a Monday, after a three-day weekend. He testified that during this three-day weekend he stayed home and rested, as he was exhausted from the previous week of Uwork. Brous-sard admitted that on the date in question the temperature was cooler than it had been the previous eight days.
Broussard’s co-worker and fellow electrician, Brad Anderson, corroborated Brous-sard’s testimony regarding the working conditions prior to the date of the accident. Anderson stated that they dug ditches the whole time and that he also suffered from heat exhaustion. He described the outdoor *1327 conditions as “burning up” and stated that those working conditions caused him to vomit on six separate occasions during the two-week period. Like Broussard, he testified that digging ditches is a laborer’s job, not an electrician’s job.
Dr. Hugo Yamada, Broussard’s physician and internal medicine specialist, testified by deposition. He explained that Broussard underwent several tests to isolate the cause, or causes, of his heart condition (the atrial fibrillation). Dr. Yamada ruled out all major causes, i.e., hypertension, thyroid problems, pulmonary embolism, etc. However, test results showed that Broussard was suffering from a “significant” electrolyte imbalance and hypokalemia, which is an abnormally small amount of potassium in the blood. After further testing, Dr. Yamada discovered that Broussard had a congenital defect called minimal mitral valve prolapse. Dr. Yamada explained that this defect, which is “very common” in the population, is usually asymptomatic and rarely requires intervention or treatment. When Daeon’s attorney asked the doctor what was the “major cause” of Broussard’s heart condition, Dr. Yamada responded “[pjrobably it was the hypokalemia [low potassium level] that triggered it.” Dr. Yamada opined that Broussard’s defect, the mitral valve prolapse, made it more | gdifficult to treat Broussard’s illness and restore his normal sinus rhythm; however, he minimized the congenital defect as a possible cause of the atrial fibrillation.
Daeon questioned Dr. Yamada concerning the possible causes of hypokalemia and Broussard’s electrolyte imbalance. When Daeon asked if the working conditions, as described by Broussard, could have caused the hypokalemia, Dr. Yamada responded, “It is very possible because if you are sweating a lot, if you are vomiting a lot, if you are having any losses, it may cause this condition [hypokalemia].” Daeon further questioned the doctor concerning the fact that, on the day of the incident, the temperatures were cooler than the previous eight days. Dr. Yamada assigned that fact little importance and explained as follows:
A I mean, — I can tell you that it [hypo-kalemia] didn’t happen over one day but it could have happened over several days and gradually — understand?
Q MR. COLE: It could be that—
A It was hot for the whole week and he was gradually losing his potassium.
When Broussard’s attorney asked if the working conditions during the week before the incident caused the hypokalemia which in turn caused the atrial fibrillation, the doctor stated “[i]t’s very possible” and “[i]t’s likely.”
Daeon presented no medical testimony or other evidence to dispute Dr. Yamada’s opinion. Nor did Daeon present a witness to dispute Broussard’s testimony regarding the working conditions or the usual duties of an electrician. Dacon’s single witness was the field investigator of their insurer, Liberty Mutual, who testified as to why benefits were withheld.
UThe hearing officer dismissed Brous-sard’s claim for failure to prove the statutory requirements of a heart-related illness. On appeal, Broussard argues that he has proved, by clear and convincing evidence, that the work Broussard did was unusual work stress for an electrician and that this unusual work stress caused the hypokalemia, which then caused the illness.
OPINION
I. Compensable heart-related injury
Because Broussard has suffered a heart-related injury, his claim is controlled by La. R.S. 23:1021(7)(e) which reads:
Heart-related or perivascular injuries. A heart-related or perivascular injury, illness, or death shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence that:
(i) The physical work stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation, and
(ii) The physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant *1328 and major cause of the heart-related or perivascular injury, illness, or death.
This statute sets forth the two requirements for recovery: (1) “extraordinary and unusual” work, and (2) causation. Furthermore, the claimant must prove both elements by clear and convincing evidence.
As to the first element, the supreme court has held that the terms “extraordinary” and “unusual” require the claimant “to prove that her physical work ^stress went beyond what was usual, regular, or customary in relation to the average employee in that occupation.” (Emphasis provided.) Harold v. La Belle Maison Apartments, 94-0889 (La.10/17/94); 643 So.2d 752, 755. In the present case, the hearing officer concluded that Broussard failed to meet the first element and gave the following reason: “While the testimony did establish that the weather was hot, it does not appear to have been unusually so. The high temperatures in the week or so before the incident ran in the low to mid-90’s. The court is unwilling to find as a matter of law that working outside in a Nomex suit in late summer in this area is an extraordinary or unusual physical work stress.”
The hearing officer’s above analysis is incorrect as applied to this case. The fact that high temperatures commonly occur in September is irrelevant. It is also irrelevant that, in general, outdoor work in such conditions is not extraordinary. There is only one relevant inquiry: would it be unusual or extraordinary for the average electrician to dig and level ditches for 10 hours a day, four days a week in the hot sun? The only testimony concerning this issue came from Brous-sard and Anderson. Both testified that they had never done this kind of work as an electrician and that the digging was usually done by laborers, not electricians. Their testimony was uncontradicted; Dacon presented no conflicting evidence on this factual issue.
In Richard v. Temple-Inland, 625 So.2d 835 (La.App. 3 Cir.1993), this court held that the claimant’s testimony alone may be sufficient to meet the applicable burden of proof if two elements are satisfied: (1) there is no other evidence to discredit or to cast serious doubt upon the claimant’s version of the incident; and (2) the claimant’s testimony is corroborated by the circumstances following the incident. | gAccording to the Richard case, the trier of fact, in evaluating the evidence, “should accept as true the uncontra-dicted testimony of a witness, even though the witness is a party, at least in the absence of circumstances in the record casting suspicion on the reliability of this testimony.” Id at 338. In the present ease, the record is devoid of any evidence to discredit or cast serious doubt upon Broussard’s testimony. Significantly, Broussard’s testimony was corroborated by another witness. In the written reasons for judgment, the hearing officer appeared to accept Broussard’s testimony as true and mentioned nothing that would make us doubt his credibility. Nevertheless, the hearing officer concluded that Broussard has not met the more stringent “clear and convincing” burden of proof imposed by La.R.S. 23:1021(7)(e).
This was error. Based on Broussard’s un-contradicted testimony and Anderson’s corroboration, we conclude that Broussard, who satisfied the clear and convincing burden of proof, met the statutory requirement of extraordinary “physical work stress.”
Having concluded that Broussard’s job of digging ditches was an extraordinary physical stress, we next focus on the second requirement imposed by the statute: Causation. We must answer this question: Was the unusual physical stress the major cause of Broussard’s illness? Specifically, Brous-sard had to prove that the extraordinary physical stress caused the hypokalemia which, in turn, was the major cause of his atrial fibrillation.
In Debona v. Pawn, 94-430 (La.App. 3 Cir. 11/2/94); 649 So.2d 449, 454, writ denied, 94-2878 (La.1/27/95); 650 So.2d 242, this court discussed the claimant’s burden in proving the causation element:
[T]he supreme court recently held, ‘a heart attack claimant’s case does not fail simply because the medical expert cannot definitively state what the primary cause of the heart attack was.’ The legislature did not intend to eliminate, altogether, heart-related injuries as compensable accidents aris *1329 ing out of and in the course of employment; it only meant to restrict recovery in some cases. (Emphasis added) (Citations omitted)
The facts of this case do not present the situation that the legislature intended to eliminate. The record reveals that, prior to the incident in question, Broussard had never been treated for atrial fibrillation, hypokale-mia, or any heart-related problem. His congenital defect was asymptomatic and unknown to Brossard before the illness, and even if the defect had been symptomatic, Dr. Yamada did not consider it a major cause of the illness.
Without question, Broussard proved, by clear and convincing evidence, that hypokale-mia was the major cause of his atrial fibrillation. While the hearing officer seemed to agree with the above statement, she disagreed with the argument that the hypokale-mia was directly caused by the unusual working conditions. Instead, she concluded that Broussard’s low potassium level could have been caused by “any number of factors.” We think the hearing officer has, in effect, imposed a burden of proof more stringent than required by the statute.
True, Dr. Yamada was unable to definitively state what caused Broussard’s hypokale-mia. But that is not required. Dr. Yamada, the only expert to testify, stated that Brous-sard’s potassium loss was a gradual process. He also testified hpthat the working conditions in the weeks preceding the illness were the “likely” or “very possible” cause of Broussard’s hypokalemia and electrolyte imbalance. Broussard’s uncontradicted testimony established that, in the weeks before the accident, he did practically nothing else but dig ditches in the heat. Dacon has advanced no other theory or evidence to explain why Broussard, who had no prior history of low potassium levels, experienced his first episode of hypokalemia only after doing the extraordinary work of digging ditches for two weeks in extreme heat.
We conclude that Broussard proved by clear and convincing evidence that the unusual working conditions caused his hypokalemia which in turned caused his atrial fibrillation. He has met the requirements of La. R S. 23:1021(7)(e) and was entitled to workers’ compensation benefits.
II. Penalties and Attorney’s Fees
It is settled that a workers’ compensation claimant is entitled to penalties and attorney’s fees if benefits are withheld or terminated arbitrarily, capriciously, or without reasonable cause by the employer. La.R.S. 23:1201 & La.R.S. 23:1201.2; Faul v. Bonin, 95-1236 (La.App. 3 Cir. 8/7/96); 678 So.2d 627, writ denied, 96-2221 (La.11/15/96); 682 So.2d 769. “The test to determine if the employer has fulfilled its duty is whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant.” Id., at 632. This court has also held that an employer or insurer “who fails to investigate an employee’s compensation claim subjects itself to statutory penalties and attorney’s fees.” Laneaux v. Opelousas Artificial Kidney Center, 93-1264 (La.App. 3 Cir. 6/1/94); 640 So.2d 701, writ denied, 94-1794 (La.10/14/94); 643 So.2d 163.
The hearing officer in the present case did not reach this issue since she dismissed Broussard’s claim as not compensable. Therefore, we have studied the record to determine if Dacon and/or its insurer had a reasonable basis for failing to pay benefits. In its brief, Dacon points to the testimony of the Liberty Mutual field investigator, who represented the insurer at trial. The field investigator gave two explanations for why her employer did not pay benefits: 1) the claim was “reported as a possible dispute by the employer”; and 2) “a typed statement from someone with Dacon Corporation — I’m not sure who it was — that the doctors thought maybe it was a virus [Broussard’s illness].”
The record does not contain the typed statement referred to by the Liberty Mutual representative. However, the record does contain a handwritten “Illness Preliminary Report” completed by Dacon’s Project Manager, Bud Cummings, on the date of the illness, September 25, 1995. In this report, Cummings stated that Broussard became ill on the job and was eventually driven to the *1330 emergency room. Cummings further explained that the doctors, having diagnosed a heart flutter, opined that the flutter “could be brought on by a number of things.” It was perhaps this statement that prompted the stance taken by the insurer. Perhaps this statement indicated the need for investigation, but it certainly was not a basis for withholding benefits.
Although Cummings clearly suffered his injury while in the course and scope of his employment, Dacon failed to investigate the claim or even contact Broussard’s doctors as to the possible causes. Dacon had knowledge of the injury in | ^September 1995 and received medical bills from Broussard beginning in November 1995. Yet, it was not until February 1996 that Dacon interviewed Dr. Yamada. We conclude that Dacon’s failure to pay benefits, without any investigation, and without anything more than a speculative basis for withholding benefits, was arbitrary, capricious, and unreasonable. We, therefore, find that penalties and attorney’s fees are appropriate in this case.
Factors used to calculate attorney’s fees in workers’ compensation cases are degree of skill and ability exercised, amount of claim, amount recovered, and amount of time devoted to case. Miller v. Roger Miller Sand, Inc., 95-1258 (La.App. 3 Cir. 3/13/96); 676 So.2d 1084, writ granted in part and reversed in part on other grounds, 96-2122 (La.11/22/96); 683 So.2d 295.
In the present case, Broussard sought legal services in late 1995, shortly after his injury. On November 1, 1995, Broussard’s attorney was forced to file a disputed claim with the Office of Workers’ Compensation. In 1996 the attorney attended the deposition of Dr. Yamada, did pretrial preparation, and, ultimately, represented Broussard at the actual trial. Under these circumstances, we find that an award of $5,000 as attorney’s fees is reasonable.
Under La.R.S. 23:1201(F), Dacon should pay the maximum penalty of $2,000. The parties stipulated to $2310 in weekly indemnity benefits and $9,023.73 in medical benefits. Attorney’s fees are fixed at $5,000.
For the foregoing reasons the judgment of the hearing officer denying benefits is reversed. Judgment is rendered awarding benefits as herein explained. 113 Judgment is further rendered granting penalties, and attorney’s fees of $5,000, and all costs.
REVERSED AND RENDERED.