706 So.2d 1052 (1998)
Ronald E. COOK
v.
KALDI'S COFFEE HOUSE.
No. 97-CA-0979.
Court of Appeal of Louisiana, Fourth Circuit.
January 28, 1998.
Rehearing Denied March 16, 1998.
*1054 Regina O. Matthews, Martzell & Bickford, New Orleans, and James P. Meyer, Aubert & Pajares, Metairie, for Plaintiff/Appellee.
Thomas M. Ruli, Charles W. Farr, Juge, Napolitano, Leyva, Guilbeau & Ruli, Metairie, for Defendant/Appellant.
Bernard J. Rice, III, Gretna, for Intervenors/Appellants.
Before KLEES, LANDRIEU and CIACCIO, JJ.
LANDRIEU, Judge.
Sometime on May 31 or June 1, 1995, Ronald E. Cook allegedly fell and injured his head while working in the storeroom/bathroom of his employer, Kaldi's Coffee House. He sought medical assistance on June 5, 1995, eventually undergoing two craniotomies. He was released from the hospital on June 19, 1995. He returned to work for Kaldi's in December of 1995, but he resigned voluntarily in March of 1996.
Cook filed for workers' compensation benefits on September 25, 1995. Kaldi's filed its answer on December 15, 1995, initially admitting that Cook had suffered a work-related injury. However, in its response to Cook's pre-trial statement, Kaldi's through new counsel disputed whether the incident of June 1st had actually occurred and whether it was a compensable accident. The Tulane Medical Group (Group) intervened on April 19, 1996, followed by Tulane University Hospital (Hospital) on July 25, 1996. It was stipulated that under the compensation schedule the Group was owed $10,851.00 and the Hospital was owed $19,625.84. Both parties are hereinafter referred to as Tulane.
Trial was held on September 12, 1996. On November 26, 1996, judgment was rendered in favor of Cook against Kaldi's awarding Cook temporary total disability benefits, from May 31, 1995, through December 25, 1995, and past and future medical benefits. On December 11, 1996, counsel for Cook sought and received approval for attorney's fees under La.Rev.Stat. 23:1141 based upon the judgment of November 26, 1996. The judgment, however, was amended on December 20, 1996, to award the past due medical benefits to Tulane.
Both Kaldi's and Cook have appealed the judgment.
On May 21, 1997, Tulane moved for a devolutive appeal from the award of attorney's fees to Cook's counsel. On May 28, 1997, the workers' compensation judge granted the appeal along with Tulane's motion to supplement Kaldi's appeal. We decline to consider Tulane's claims, because its motion for appeal from the order of December 11, 1996, was not timely filed under La.Rev.Stat. 23:1310.5.

FACTS
Cook testified that he had been employed as a manager at Kaldi's on May 31, 1995. He remembered working in the upstairs storeroom/bathroom in preparation for an out-of-town exhibit. He next remembers waking up in Tulane's hospital. He has no other memory of the incident. As to the intervening days, he only remembers "bits and pieces." He did recall bringing his bicycle to a shop to be repaired after he left Kaldi's. He explained that the tires on the bicycle had been "slashed" and the rims bent. Some time after he was released from the hospital, Cook returned to the hospital claiming that he had struck the top of his head on a street sign. This injury did not require surgery.
Cook admitted that he earned $323.00 per week before the accident and that he earned $343.00 per week when he returned to work six months later. In early 1996, he and Kaldi's agreed to open a restaurant in a strip club on Bourbon Street; however, either he or Kaldi's pulled out of the deal. Cook resigned from Kaldi's and along with his girl friend opened the restaurant, but they later closed it because of slow business. Cook *1055 explained that he left Kaldi's because he believed that he had been damaging its business as the result of his inability to think clearly at work. He did not say if he was working at the time of trial.
Cook's girl friend, Suzanne Pohl, testified that Cook took her to the airport in his truck on May 31, 1995. She testified that she tried to call him at home from her destination in Rhode Island. When she did not reach him at home, she left a message. She then called the coffee house the next morning at 5:00 a.m. local time. An employee of Kaldi's whom she identified as Dan Baldwin answered the telephone.[1] Over Kaldi's objection, she testified that Baldwin told her that Cook was asleep in the bathroom, that he was leaning against the door preventing it from opening, and that he could not be awakened. Pohl told Baldwin to let Cook sleep.
Pohl returned to New Orleans on the day that Cook was taken to Tulane Hospital, June 5th. She said that another manager's girl friend had taken Cook to the hospital.[2] She also stated that Cook was found lying in his own vomit, feces, and blood. Pohl did not say where Cook was found, nor did she identify either the person who had told her this or the person who had found Cook.
As to the slashed bicycle tires, Pohl explained that an unnamed person had slashed the tires on the bicycle, on her car, and on Cook's vehicle and that she and Cook had obtained a peace bond on the individual.
Dr. Nancy Rogers was the neurosurgeon who operated on Cook. Her testimony, consisting of a deposition, was entered in evidence. She was accepted by the parties as an expert in neurosurgery. She explained that Cook had suffered an epidural hematoma and a subdural hygroma. Immediate surgery was required to relieve the pressure on the back right side of the brain. Although the first surgery was successful, a subdural hygroma developed requiring a second craniotomy. She opined that, when Cook left the hospital, his headaches had lessened and that the only further medical care recommended was a neuropsychiatric evaluation. Cook, however, had refused such care. Over the next follow-up visits, Cook's condition improved; however, she noted concern as to Cook's ability to think clearly and again recommended neuropsychiatric testing.
As to the origin of the hematoma, Dr. Rogers explained that the injury was consistent with either a fall or a blow to the back of the head. She noted that the injury could have occurred six days before Cook entered the hospital. According to the medical records, Cook indicated upon admittance that he had been injured six days earlier in a fall. Although the medical form indicates that the accident was not work-related, Dr. Rogers explained that a clerk had completed the form and that she (Dr. Rogers) had no independent memory as to whether Cook had mentioned the location of the accident.
Other medical records, primarily histories prepared by other hospital personnel, indicated that Cook had fallen in a bathroom and that he had been found lying in blood. The source of this information was unclear.[3]
Kathleen Cascio testified as to Cook's work duties and salary. She stated that Cook had earned $323.00 per week before the accident and $343.00 per week after the accident. About a month after the accident, Cook began arriving at the coffee house for short periods during the day, but he was not paid. Eventually, in December of 1996, he returned to full-time employment. She stated that, though he had the same job classification, his management duties were somewhat restricted on account of his injury. Notably, she testified that on June 1, 1995, she arrived at work around 8:00 a.m. When *1056 she inquired as to Cook's whereabouts, she was informed that he had passed out in the bathroom upstairs.

DISCUSSION
The first issue before us is whether the workers' compensation judge's factual finding that Cook sustained a work-related injury was manifestly erroneous or clearly wrong.[4]
Kaldi's asserts the workers' compensation judge manifestly erred in finding that Cook had satisfied his burden of proving by a preponderance of the evidence that he suffered an accident during the course and in the scope of his employment with Kaldi's. Kaldi's argues that no one witnessed the accident and that Cook himself did not know how, where, or when he was injured. The coffee house points out that there was an equal possibility that Cook was injured in a bicycle accident, because Cook's bike was badly damaged around the time the injury allegedly occurred. Finally, Kaldi's points out that Pohl's knowledge of the accident consisted entirely of hearsay. Although it concedes that the evidentiary rules are relaxed in workers' compensation proceedings, Kaldi's argues that the judge should not have relied exclusively on such inherently unreliable testimony. Kaldi's cites La.Rev.Stat. 23:1317 for the proposition that the judge's findings of fact must be based upon "competent evidence."
A claimant in a workers' compensation case has the initial burden of proving that a work-related accident occurred. Nelson v. Roadway Express, Inc., 588 So.2d 350 (La. 1991). An accident is defined as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.Rev.Stat. 23:1021(1).
The plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. Bruno v. Harbert Int'l Inc., 593 So.2d 357, 361 (La.1992).
A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses, or friends. Corroboration may also be provided by medical evidence.
Bruno, 593 So.2d at 361 (citations omitted).
The judge's determinations as to whether the worker's testimony is credible and whether the worker discharged his burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706.
The majority of the evidence supporting Cook's claim was decidedly hearsay. However, the specific exclusionary rules of the Code of Evidence "shall be applied [in workers' compensation cases] to the extent that they tend to promote the purposes of the proceeding." La.Code Evid. art. 1101 B. The article states that "the principles underlying this code shall serve as guides to the admissibility of evidence." La.Code Evid. art. 1101 B. Rather than the competence of hearsay evidence, the focus of Louisiana courts considering hearsay evidence is the weight to be attributed to such evidence. See H.A. Johnson, Workers' Compensation Law and Practice, 14 La. Civil L. Treatise, § 390 (1994).
Kaldi's argument relies on our affirmance of the judge's dismissal of the claim in Lee v. Winn-Dixie of Louisiana, Inc., 593 So.2d 961 (La.App. 4 Cir.1992). There, the claimant was discovered by a co-worker on the floor of a deli freezer at work. On the same day, the claimant spoke with the store manager and asked him whether an accident report had been completed. She claimed that she had suffered amnesia as a result of the alleged accident. At trial, the co-worker *1057 testified that he had seen the claimant on the floor and had believed her to be unconscious. The judge, however, concluded that the claimant had not been suffering from psychogenic amnesia and that no accident precipitating the alleged amnesia had occurred. We affirmed, noting that the judge had been within her discretion in dismissing the testimony of the claimant and her husband as unworthy of belief and that no medical evidence corroborated the claimant's contention that she was injured in a work-related accident.
In this case, the inquiry as to whether an accident actually occurred on Kaldi's premises was complicated by the claimant's memory loss and the absence of eyewitnesses to the accident. The judge evidently found that Cook had suffered a work-related accident in the upstairs storeroom on May 31, 1995, which knocked him unconscious and caused him to become disoriented for six days. This finding was not manifestly erroneous or clearly wrong.
Cook testified that his only memories surrounding the accident were working in the storeroom and waking up in the hospital. He could only recall fragments of events which occurred between, including taking his bicycle to be repaired. The medical records for June 5, 1995, indicate that Cook or the person who had taken him to the hospital had informed hospital staff that he had fallen six days earlier and had been found in a bathroom. The neurosurgeon who performed the craniotomies stated that the blood clots in the wound were consistent with the injury having been inflicted six days earlier. She also stated that this type of accident could cause the type of memory loss experienced by Cook.
As to the hearsay evidence, Cook's counsel asserted that Baldwin, who allegedly told Pohl about Cook sleeping in the bathroom, could not be located and was unavailable. The reliability of Pohl's testimony, given that she was Cook's girl friend and was, therefore, an interested witness, merited close scrutiny. However, Kaldi's own witness, Cascio, also stated that she had been informed that Cook had passed out in the bathroom/storeroom on the morning of June 1, 1995. This testimony was elicited by questions from the judge and was not objected to by Kaldi's counsel. Pohl's and Cascio's testimony taken together suggested a higher degree of reliability; consequently, the judge was reasonable in accepting Pohl's and Cascio's testimony as corroborative of Cook's claim that the accident occurred while he was working at Kaldi's on May 31st.
Accordingly, we cannot say that the workers' compensation judge was clearly wrong in finding that Cook had been injured in a work-related accident.
We next turn to Cook's cross-appeal claims: (1) that the workers' compensation judge erred by failing to make an award for future disability and (2) that the judge erred by failing to find that Kaldi's refusal to pay benefits was arbitrary and capricious. Appellate counsel for Cook also claims that she is entitled to an additional award of attorney's fees as a result of the appeal. These claims are without merit.
In his first claim, Cook asserts the judge erred in failing to award additional total disability benefits or supplemental earnings benefits. Cook points to Dr. Rogers's testimony regarding his inability to do some unspecified types of work, administrative duties as opposed to more physical labor, and the unlikelihood of full recovery from the brain damage he suffered.
Cook, however, failed to meet his burden of proving eligibility for additional disability benefits. Dr. Rogers testified that she had last seen Cook on November 9, 1995, and could not comment as to his status at the time the deposition was taken, September 5, 1996. She emphasized that a neuropsychiatric evaluation was necessary to determine the extent of any impairment to Cook's memory, judgment, and cognitive ability, as well as to ascertain the need for neuropsychiatric therapy and/or rehabilitation. No such evaluation was performed. Although Pohl and Cascio testified that Cook behaved differently after the accident, Cook returned to work, where he earned $20.00 per week more than his pre-injury wage. He later voluntarily left his employment with Kaldi's to open a restaurant. According to his own testimony, *1058 Cook closed the restaurant because of poor profits, rather than his inability to handle business operations. Though Cook believed he had adversely affected Kaldi's business because of his incapacity to think clearly, no evidence suggested that Kaldi's had been unsatisfied with Cook's performance as a manager at the time he resigned. Cook thus failed to introduce sufficient evidence establishing that he had continued or would continue to suffer total disability as a result of the accident or that he would be unable to earn at least ninety per cent of his pre-injury wages.
Given this evidence, we find no error in the judge's refusal to award additional disability benefits.
Next, Cook alleges that Kaldi's was arbitrary and capricious in rejecting his claim for compensation and medical benefits. The penalty provision in effect at the time of the injury applies. Maiden v. Crossroads of Louisiana, Inc., 95-1985 (La.App. 4 Cir. 7/24/96), 678 So.2d 75; writ denied, 96-2145 (La.11/8/96), 683 So.2d 279. Under La.Rev. Stat. 23:1201 B:
The first installment of compensation payable for temporary total disability ... shall become due on the fourteenth day after the employer or insurer has knowledge of the injury ..., on which date all such compensation then due shall be paid.
Failure to pay timely "any compensation or medical benefits payable without an order" shall result in a penalty of twelve percent of the unpaid compensation or "a total penalty of fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid, whichever is greater," unless the claim is "reasonably controverted" by the employer or insurer. La.Rev. Stat. 23:1201 E (prior to amendment by Acts 1995, No. 1137, § 1, eff. June 29, 1995). The test to determine whether the claimant's right has been reasonably controverted "turns on whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant." Caesar v. Crispy Cajun Restaurant, 94-30, pp. 8-9 (La.App. 3 Cir. 10/5/94), 643 So.2d 471, 477, writ denied, 94-2736 (La.1/6/95), 648 So.2d 931.
Attorney's fees, not subject to the limitation provided for in La.Rev.Stat. 23:1141, may be assessed against the employer for failure to pay a claim within sixty days after receipt of written notice when such failure is arbitrary, capricious, or without probable cause. See La.Rev.Stat. 23:1201.2 (prior to amendment by Acts 1995, No. 1137, § 1, eff. June 29, 1995). "Whether or not the refusal to pay is arbitrary, capricious, or without probable cause depends primarily on the facts known to the employer at the time of its action, and the failure to pay is not arbitrary and capricious when it is based upon a substantial bona fide factual contention." Maiden, 95-1985, p. 7, 678 So.2d at 79.
Cook argues that Kaldi's refusal to pay his claim was arbitrary and capricious, because Kaldi's knew: (1) Cook had obviously suffered an injury; (2) his last memory was of working in the storeroom; (3) someone told Cascio on June 1, 1995, that Cook was passed out in the storeroom; (4) the emergency room admittance form notes that Cook was found passed out in a bathroom; and (5) Kaldi's initially admitted that Cook had been injured in a work-related accident. Although Cook essentially alleges that Kaldi's was aware, at the time of its refusal to pay, of the hearsay information known to Pohl, there is no such showing in the record.
On the other hand, Kaldi's knew that Cook was unable to remember anything about the accident and that he had waited six days before seeking medical assistance, though the delay was later explained by the injury to Cook's brain. Other hospital records indicated that Cook had said that the unnamed person who had caused his injury refused to admit responsibility. Further, no one witnessed the incident; nor, apparently, has anyone come forward who actually saw Cook passed out in the storeroom/bathroom. Cook does not allege that Baldwin, or anyone else who may have had first-hand knowledge of the accident, ever provided Kaldi's management with any information. At most, Cascio, the Kaldi's employee who issued payroll checks, was told by someone that Cook had *1059 passed out in the storeroom/bathroom. Notably, neither Cascio nor Pohl became alarmed at this news. Cook also does not claim that evidence of the alleged fall, such as blood, was ever discovered in the storeroom/bathroom. Additionally, there was a plausible allegation that Cook had been injured in a bicycle accident. Thus, it was not unreasonable for Kaldi's to question Cook's contention that the accident had occurred on Kaldi's premises. Because there was a bona fide dispute as to the occurrence of a compensable accident, Kaldi's did not act arbitrarily, capriciously, or without probable cause in refusing to honor Cook's claim for benefits. The workers' compensation judge did not err in failing to find otherwise.
Finally, Cook's appellate counsel asks for an additional award of attorney's fees. However, she does not direct our attention to any statute authorizing such fees, absent a showing of an arbitrary and capricious refusal to pay the claim. La.Rev.Stat. 23:1141, which sets a limit on attorney's fees, does not provide for additional attorney's fees incurred on appeal. As discussed below, the judge approved attorney's fees equal to the statutory limit.
In Barrow v. Allstate Ins. Co., Inc., 496 So.2d 1156 (La.App. 4 Cir.), writ denied, 497 So.2d 1020 (La.1986), we declined to award additional attorney's fees on appeal, because the insurer's refusal to pay the worker's claim was not arbitrary, capricious, or without probable cause. Though its eyewitness's version of the incident was not accepted by the trial judge, the insurer was not unreasonable in relying on the witness's testimony.
In Miller v. City of New Orleans, 95-1005 (La.App.12/14/95), 665 So.2d 1293, we observed that:
An increase in attorney's fees is usually awarded when the defendant appeals and obtains no relief, and when the appeal has necessitated additional work on the part of plaintiff's counsel, provided that plaintiff has requested the increase in accordance with proper appellate procedure.
Miller, 95-1005, p. 13, 665 So.2d at 1300.
However, we awarded $500.00 in additional attorney's fees for the appeal, because "the City's filing and continued prosecution of this suspensive appeal [was] frivolous, requiring counsel for Chief Miller to prepare an answer to the appeal and an appellate brief." Id., pp. 13-14, 665 So.2d at 1300.
In Billiot v. Alton's Bakery of Morgan City, Inc., 398 So.2d 624 (La.App. 3 Cir. 1981), the employer was found to have acted arbitrarily and capriciously in declining to pay the worker's claim. However, the Third Circuit declined to award additional attorney's fees for the appeal, reasoning that the worker had sought additional relief denied at the trial level and denied on appeal. Accord Ebey v. Dolphin Const. Co., 435 So.2d 1154 (La.App. 3 Cir.1983).
In the instant case, Cook answered Kaldi's appeal to protect his own rights; however, he has unsuccessfully sought additional relief in this Court which was not granted by the workers' compensation judge, namely additional disability benefits and penalties under La.Rev.Stat. 23:1201. Furthermore, Cook's counsel was awarded the maximum contingency fee under La.Rev.Stat. 23:1141 B, as amended by Acts 1995, No. 609, § 1. Finally, the award of additional attorney's fees is "clearly warranted when it is manifest that the appeal was taken solely for delay or that the appealing counsel does not sincerely believe in the view of the law he advocates." Hickman v. City of New Orleans, 95-0210 (La.App. 4 Cir. 12/28/95), 666 So.2d 696, 699, writ denied, 96-0264 (La.4/19/96), 671 So.2d 927. Cook's counsel has not established either of these conditions; accordingly, we deny her request for additional attorney's fees on appeal.
The judgment of the workers' compensation judge is affirmed in all respects.
AFFIRMED.
NOTES
[1] Cook's counsel stated that attempts to locate Baldwin were unsuccessful and that Baldwin was believed to be in South America.
[2] This person was not called to testify. The Tulane medical records indicate that an unidentified friend brought Cook to the hospital emergency room.
[3] On some of these forms, Cook is indicated as a "part owner" of the coffee house. Though Kaldi's notes that the forms indicated that the injury was not work-related, the forms also indicate that Kaldi's was the guarantor for payment. Dr. Rogers testified that Cook expressed concern about payment of his medical bills and that he was informed by a clerk that the costs would be covered by workers' compensation.
[4] "Hearing officer" was changed to "workers' compensation judge" by Acts 1997, No. 88, § 1.