## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**25-681**

**DANA CORMIER**

**VERSUS**

**SWLA CENTER FOR HEALTH SERVICES AND
LOUISIANA WORKERS' COMPENSATION CORPORATION**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 3
PARISH OF CALCASIEU, NO. 22-06547
THOMAS E. TOWNSLEY, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Guy E. Bradberry, and Clayton Davis, Judges.

**REVERSED AND RENDERED.**

Gregory P. Marceaux
Marceaux Law Firm
2901 Hodges Street
Lake Charles, LA 70601
(337) 310-2233
COUNSEL FOR PLAINTIFF/APPELLANT:
    Dana Cormier

Alysha B. Smith
Johnson, Rahman & Richards
P.O. Box 98001
Baton Rouge, LA 70898-8001
(225) 930-0414
COUNSEL FOR DEFENDANTS/APPELLEES:
    SWLA Center for Health Services
    Louisiana Workers' Compensation Corporation

**KYZAR, Judge.**

In this workers' compensation case, Plaintiff, Dana Cormier, appeals the judgment of the workers' compensation judge (WCJ) holding that she failed to prove that she suffered an injury as a result of an accident while in the course and scope of her employment with SWLA Center for Health Services (SWLA), and thereby, dismissing her claim. For the following reasons, we reverse and render.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff has been employed as a medical assistant by SWLA since 2012. In 2021, she was assigned to SWLA's Sowela Technical Community College (Sowela) medical clinic, which is located in the Charleston Building on Sowela's Lake Charles campus. Five SWLA employees worked in the clinic: Plaintiff; Nurse Practitioner Allissa Joseph (NP Joseph); Melinda Beasley, a medical assistant; an unnamed medical assistant; and an unnamed laboratory technician.

Plaintiff's workstation was in the clinic's lobby, about twenty feet from a wall, which SWLA shared with Sowela's culinary department. The culinary department had a kitchen equipped with gas stoves and ovens.

On November 2, 2022, Plaintiff arrived at work wearing an N95 mask because of the COVID outbreak. NP Joseph testified that when she arrived that morning, she smelled gas throughout the clinic, including the lobby where Plaintiff's workstation was located. Ms. Beasley also testified that she smelled gas throughout the day and that she discussed the gas smell with her co-workers, who all indicated that they also smelled gas.

Although Plaintiff's co-workers complained of the gas smell, she did not notice the smell initially because of her N95 mask. However, just after the clinic closed, Plaintiff went outside of the clinic to assist a gentleman that had knocked on

the clinic's door. When she returned to the clinic, she was not wearing her mask. It was at this time that Plaintiff first noticed a strong gas smell. When she went to the nurses' office to ask if the nurses smelled the gas, they all confirmed the strong smell.

Plaintiff attempted to report the smell to her supervisor, Sharon Dunbar, but was unable to reach her. She then notified a security guard about the odor, who advised that he would inform the Sowela administration about the smell. The guard was eventually able to advise Ms. Dunbar about the odor. Ms. Dunbar, in turn, reported the odor to Adam Reed, the executive director of facilities, planning, and management for Sowela.

After approximately thirty minutes of smelling the gas, Plaintiff began to experience a headache and dizziness. She then left the building and got into her vehicle, where she passed out. When Plaintiff came to, she realized that she had urinated on herself. Although she drove herself home, she had no recollection of doing so. She was then helped into the home by her husband.

Once home, Plaintiff went to bed, but because she was still suffering from dizziness and a headache, she was taken to CHRISTUS St. Patrick Hospital (St. Patrick) by her husband later that evening. There she was seen by Dr. William Laborde, an emergency room physician, with complaints of generalized weakness, blurred vision, shortness of breath, nausea, and headaches, which she attributed to "inhaling gas at work." Although there is no specific test to establish gas exposure, Dr. Laborde ordered an arterial blood gas test to determine the level of carbon monoxide in Plaintiff's blood. The test results did not show elevated levels of carbon monoxide. Plaintiff was then provided medication and discharged home.

Plaintiff stayed in bed the next day still suffering from weakness and a headache. She was able to advise Ms. Dunbar about the gas inhalation and her inability to work.

When Plaintiff's co-workers returned to work on November 3, 2022, the gas smell was still present. This was reported to the Sowela administration, who in turn contacted CenterPoint Energy (Centerpoint). Brandon Davis, a service technician, was sent to Sowela, and upon his arrival, he noted that a group of people reported smelling gas. In investigating the origin of the gas, Mr. Davis entered the culinary department and discovered that a pilot light on a gas stovetop was extinguished. If the pilot light is out, gas will continue to emit until the pilot light is relit or the gas is shut off. Mr. Davis did not smell any gas, nor did his combustible gas indicator[1] (CGI) detect the presence of gas.

Plaintiff returned to St. Patrick on November 5, 2022, complaining of left-sided numbness and weakness.[2] She was referred to a neurologist. On November 14, 2022, she was examined by her primary care physician, Dr. Christian LeBlanc, who noted that Plaintiff had inhaled fumes at work and diagnosed her with left-sided paralysis and tremors. Dr. LeBlanc restricted Plaintiff from working.

---

[1] A combustible gas indicator is an instrument that monitors the gas, carbon monoxide, and oxygen present in the air.

[2] At the emergency room, Plaintiff underwent a drug screen which was positive for opiate, amphetamine, and benzodiazepine. Plaintiff explained that she was prescribed amphetamine for ADHD, benzodiazepine for anxiety, and the opiate was associated with the hydrocodone she was taking for pain following the gas exposure. The hydrocodone had been prescribed to Plaintiff following cervical surgeries she had undergone in 2017 or 2018.

On February 9, 2023, Plaintiff was examined by Dr. Fayez Shamieh, a neurologist. She presented with weakness,[3] numbness, and dizziness. Dr. Shamieh felt Plaintiff was suffering from post-chemical exposure, encephalopathy, and seizure disorder. He ordered an EEG; however, SWLA and its insurer, Louisiana Workers' Compensation Corporation (LWCC) (referred to collectively as Defendants) had already refused her claim and authorization was denied.[4]

Due to Defendants denial of her workers' compensation claim, Plaintiff became Medicaid qualified. On April 3, 2024, Plaintiff came under the care of the Allen Parish Rural Health Clinic (Rural Health Clinic). By this time, NP Joseph had begun to work at the Rural Health Clinic as a nurse practitioner. NP Joseph noted that Plaintiff was previously exposed to natural gas, and as a result, had suffered a seizure and neurological issues. In her opinion, Plaintiff was suffering from panic disorder and PTSD. Plaintiff was referred to a neurologist and restricted from working.

Plaintiff came under the care of Dr. Reynard Odenheimer, a neurologist. On October 9, 2024, Dr. Odenheimer performed an EMG, which showed changes consistent with left-sided sensory motor polyneuropathy. He was of the opinion that Plaintiff was suffering from nerve damage on the left side. He noted that Plaintiff had inhaled fumes at work and suffered from left-sided hemisensory, migraines,

---

[3] Although Dr. Shamieh's records state that Plaintiff suffered from right-sided weakness, all of her symptoms were, in fact, on her left side.

[4] According to Defendants' discovery responses, Plaintiff, on November 30, 2022, made a demand for the payment of workers' compensation indemnity benefits and authorization for medical treatment, which was denied by Defendants. Plaintiff filed a LWC-WC-1008 claim with the Office of Workers' Compensation on December 14, 2022.

dystonia tremors,[5] and chemical exposure. Dr. Odenheimer felt that Plaintiff was unable to work.

Trial of the matter was held on June 11, 2025. At the end of trial, the WCJ orally denied Plaintiff's claim. In his November 2, 2025 judgment, the WCJ held that Plaintiff failed to prove "she suffered an "injury in an accident during the course and scope of her employment with her employer, [SWLA], and its insurer, LWCC, on November 2, 2022." The judgement further held:

> Claimant had a pre-existing history of epilepsy (seizure disorder) with recurrent seizures. She had at least three (3) prior seizures before the November 2, 2022, seizure in question and had a subsequent seizure in June 2023. The Court also found serious inconsistencies in when and where the seizure occurred on November 2, 2022.

Based on this finding, Plaintiff's claim was dismissed with prejudice.

Plaintiff now appeals the WCJ's judgment, asserting the following assignments of error:

1. The trial court committed legal error in placing an artificial "high burden" of proof on Dana Cormier to show a causal link between the natural gas exposure and her disability.

2. The trial court erred in finding that the pre-existing seizure condition of Dana Cormier prevented her from recovering workers' compensation benefits.

3. The trial court erred in finding natural gas was not in the air at the SWLA Center for Health Services.

4. The trial court erred in allowing an uncertified opinion letter of the defendant's expert into evidence.

5. The trial court erred in rejecting the opinion testimony of Dr. Reynard Odenheimer, neurologist, and Nurse Practitioner Alissa Joseph.

6. The trial court erred in failing to award penalties and attorney's fees.

---

[5] Dystonia is a movement disorder that includes involuntary, painful contractions of the body.

**OPINION**

*The WCJ's finding that gas was not present at SWLA's clinic.*

As part of his oral ruling, the WCJ found that there was no incident where gas or other toxins were leaked into the air at SWLA's clinic on November 2, 2022:

> And the deposition of Brandon Davis, a CenterPoint Entergy [sic], on page -- that's "Defense Exhibit 8" and Page[s] 13 and 14. He testified, "so I did my incident investigation in there first with my CTI and my nose and then I didn't smell anything and my CTI didn't pick up anything." Page 16, he said he saw the pilot light was out in the stove in the kitchen.
>
> Page 34, his CTI machine measured 0.0 on November 3rd, 2022. On Page 34 and 35 he said -- he reported upon arrival no loop found. He checked the appliances. He didn't find the leak. He checked the drains in the restrooms for sewer gas and didn't find a leak there but he did notice and see visually that the pilot light was on.
>
> On Page 37 on how close he was to the pilot light area, he said, quote, "I was right -- I got all the way to the -- to the range and saw that it was out. And that's what I mean. I didn't pick up anything on my CTI, even standing right next to the -- you can stand right next to the stove with the CTI, and it's not in the air."
>
> . . . .
>
> Nurse practitioner Allissa Joseph said that she smelled gas. Nobody else smelled it. The testimony was that Ms. Cormier didn't smell [gas] because she had the mask on until between 4:00 and 4:30 and then after getting the security guard - he didn't smell gas according to Adam Reed and they -- Brandon Davis said he didn't smell gas the next day even though he saw the pilot light on. I do think mercaptan has a strong smell, and they smelled mercaptan because of the pilot light being on.

In discussing the deference afforded a trial court's factual finding, this court in *Thymes v. Golden Nugget Lake Charles, LLC*, 23-100, pp. 4–5 (La.App. 3 Cir. 11/2/23), 373 So.3d 129, 133 (alterations in original), *writ denied*, 23-1576 (La. 1/24/24), 378 So.3d 69, stated:

> When reviewing a verdict in a civil case, the manifest error-clearly wrong standard applies, and the appellate court should not disturb a finding of fact made in the trial court unless it is clearly wrong.

6

The Louisiana Supreme Court fashioned a two-part test when applying this standard: (1) is there a reasonable factual basis for the finding of the trial court; and (2) does a reading of the record establish that the finding is not clearly wrong or manifestly erroneous. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). In *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989), the court discussed the manifest error-clearly wrong standard in detail, stating:

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978); *Canter v. Koehring*, 283 So.2d 716, 724 (La.1973). . . . [I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Arceneaux*, supra at 1333, *Watson v. State Farm Fire & Casualty Ins. Co.*, 469 So.2d 967 (La.1985). . . .
>
> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Canter*, supra at 724.

Contrary to the findings of the WCJ, the evidence presented at trial overwhelmingly established the presence of a gas or toxic-like smell in Plaintiff's workplace. Mr. Davis's deposition testimony revealed that he was dispatched to Sowela because of a gas complaint on November 3, 2022, the day after the event. Upon arrival, he acknowledged that a group of people complained about the smell of gas. On entering the culinary department's kitchen, he observed that the pilot light on a gas stovetop was not lit. Although gas was being released through the unlit

7

pilot-light hole, Mr. Davis stated that he smelled no gas at that time. After shutting off the kitchen's gas valve, he ran a test with his CGI monitor, which detected no gas. Mr. Davis then turned the gas valve on and relit the pilot light.

Mr. Reed testified that on November 2, 2022, he was advised of a gas smell in the SWLA clinic, which had caused someone to feel faint. Security guards, who were sent to investigate, reported that they smelled something strong in the clinic but did specifically report that the smell was natural gas. The following day, the gas smell was again reported, and CenterPoint was contacted, resulting in Mr. Davis being dispatched to the facility.

NP Joseph, who was accepted as an expert on the standard of care applicable to nurse practitioners, testified that she had worked with Plaintiff for eighteen months at SWLA. She described Plaintiff as a very trustworthy, dependable employee. NP Joseph testified that on November 2, 2022, she was the last employee to arrive at the clinic, and she immediately smelled what she thought was natural gas. She asked the other employees if they smelled anything, and they indicated they did not. NP Joseph stated that she smelled gas the entire day, and she explained that besides Plaintiff, a laboratory technician also became sick from the gas smell and required medical treatment. She pointed out that even if Mr. Davis did not detect any gas, he was not at the clinic until the day after the gas smell was first reported.

Ms. Beasley testified that on November 2, 2022, she and the other employees discussed the gas smell. All of the employees were wearing their N95 masks. She stated that the smell seemed to fade over time, but it seemed stronger after she left and then returned to the clinic. Ms. Beasley confirmed that NP Joseph complained about the gas smell, as did all of the employees. She also recalled that a laboratory

8

technician told her that she was not feeling well that day, but she did not know if the technician was medically evaluated.

Natalie Brooks testified that she was employed at SWLA as a patient access registrar. Although she was not present at the clinic on November 2, 2022, she did work on November 3, 2022, and she did smell something like gas.

Plaintiff testified that although NP Joseph complained of the smell of gas, she did not smell anything initially because of her N95 mask. She did, however, notice a strong gas odor at the end of the day after she left and then returned to the clinic without her mask on. When she was unable to contact her supervisor, Plaintiff reported the smell to a security guard, who indicated that he smelled something and would report it.

The evidence at trial established that the only person who did not smell gas was Mr. Davis, although he admitted that gas would have been flowing from the stove's unlit pilot light. He indicated that he tested for gas in the kitchen, but this was after he turned off the gas at the source. Additionally, Mr. Davis was not present at the clinic on November 2, 2022. Multiple witnesses testified that they smelled gas or an odor at the clinic on that day. We, therefore, find manifest error in the WCJ's finding that there was no accident associated with the release of gas into the work environment on November 2, 2022.

*Whether there was a causal link between the gas exposure and Plaintiff's disability.*

It is apparent to this court that from the outset, the WCJ identified Plaintiff's disabling condition as a seizure or seizures rather than the left-sided neurological impairments she suffered as a result of the gas exposure as established by the medical evidence and expert testimony. The WCJ's oral ruling makes this clear:

9

I didn't have any testimony to say that the smell triggered a pre-existing seizure disorder. If I had that, I would have related the seizure to the smell at the Sowela building on - the Charleston Building.

On June 5th, 2023, as I stated earlier, there was a report of another seizure or seizure activity. Natural gas is odorless. Mercaptan has the smell of rotten eggs or sulfur. To cause a seizure, to cause the actual seizure, with regard to natural gas or mercaptan, either one, it takes a large dose or long-term exposure to deprive the brain of oxygen. In order to determine that, it can be shown in blood work. So, Dr. Laborde did blood work and said it didn't show anything.

I think the claimant suffered a pre-existing condition of epilepsy and recurring seizures. She had a seizure that day. I don't know what triggered it. I don't feel that she's met the burden, that she has shown that there was a gas leak that caused her seizure.

I think that Brandon Davis and Dr. Laborde said there was no objective evidence of any gas exposure that would have caused the carbo-oxyhemoglobin level on her blood, so there wasn't a deprivation of oxygen. There was no objective evidence of anything other than an epileptic seizure that evening after she returned to her house.

There wasn't any testimony from any medical provider that really elicited or demonstrated that the smell triggered the seizure for Ms. Cormier.

In *Barber Brothers Contracting v. Young*, 03-747, pp. 3–6 (La.App. 1 Cir. 2/23/04), 873 So.2d 677, 679–81, *writ denied*, 04-704 (La. 5/7/04), 872 So.2d 1084, the court addressed what a workers' compensation claimant must prove to establish that his work-related accident caused or contributed to his disability, stating:

In order for the employee to recover workers [sic] compensation benefits, it must be determined that the employment somehow caused or contributed to the disability, but it is not necessary that the exact cause be found. *Walton v. Normandy Village Homes Assn. Inc.*, 475 So.2d 320, 324 (La.1985). If the employee suffered from a pre-existing medical condition, the employee may still prevail if he proves the accident aggravated, accelerated, or combined with the infirmity to produce the disability for which compensation is being paid. *Peveto v. WHC Contractors*, 93-1402, p. 2 (La. 1/14/94), 630 So.2d 689, 691. The Louisiana Supreme Court recognized the existence of a presumption to aid plaintiffs in cases involving pre-existing conditions. *Id.* Specifically, when an employee proves that before the accident he had not manifested disabling symptoms, but commencing with the accident disabling symptoms appeared, and that medical or

10

circumstantial evidence indicates a "reasonable possibility" of a causal connection between the accident and the activation of the disabling condition, the employee's work condition is presumed to have aggravated, accelerated or combined with his pre-existing disease to produce the disability. *Id.*

. . . .

Once the employee has established the presumption of causation, the opposing party bears the burden of producing evidence to prove that it is more probable than not that the work injury did not accelerate, aggravate, or combine with the pre-existing injury to produce his disability. *Preveto*, 93-1402, pp. 2–3, 630 So.2d at 691. Medical testimony, albeit significant, is not conclusive as to the issue of causation, which is generally the ultimate fact to be decided by the court after weighing all the evidence. *Id.*

On November 2, 2022, Plaintiff presented to St. Patrick at around 9:38 p.m., with complaints of gas inhalation and symptoms of dizziness, weakness, shortness of breath, and nausea. She was seen by Dr. Laborde, who ordered an arterial blood gas test to measure the carbon monoxide in her blood. In his deposition, Dr. Laborde explained that carbon monoxide is a byproduct of natural gas. The test results revealed that Plaintiff's blood level was not elevated at the time she presented. The fact that it was not elevated would indicate that she did not take in sufficient quantities of carbon monoxide. Dr. Laborde did state, however, that there is no specific test to determine if a patient has been exposed to natural gas. Although the length of time between Plaintiff's exposure and the test would result in a much lower carbon monoxide level, the fact that she was still symptomatic led him to believe that carbon monoxide was not causative of her continuing symptoms. Dr. Laborde testified that although he found no objective findings, Plaintiff's subjective symptoms were consistent with gas exposure. As such, he could not say to a reasonable medical certainty that Plaintiff's seizure was caused by her gas inhalation

11

as opposed to her epileptic history. Plaintiff was provided medication and discharged home.

Plaintiff returned to St. Patrick on November 5, 2022, with concerns of having suffered a stroke, however, CT scans of her brain and lumbar spine were normal. Plaintiff complained of weakness and numbness on her left side. On November 14, 2022, Plaintiff was examined by Dr. LeBlanc, who diagnosed her with left-sided paralysis and tremors and restricted her from working.

The WCJ felt that Plaintiff's condition was caused by her "pre-existing condition of epilepsy and recurring seizures." Plaintiff's medical history indicated that she initially suffered a seizure on May 16, 2021. At the time, Plaintiff went to St. Patrick, where she was seen by Dr. Timothy Best, a neurologist, who prescribed anti-seizure medication. Plaintiff also saw Dr. LeBlanc on May 21, 2021, who noted that she had experienced a seizure with no head injury. Plaintiff advised that she became confused when she sat down to eat, at which time her whole body shook, and she urinated on herself. Dr. LeBlanc's diagnosis included "[e]pilepsy and recurrent seizures[,]" and his report provided, "New onset seizures." Plaintiff was referred to Dr. Best for an evaluation.

On Plaintiff's July 9, 2021 office visit to Dr. LeBlanc, she requested a clearance to return to work. It was noted that she had been seen by Dr. Best and had undergone an EEG. She stated that the vision in her left eye had been blurry since the May 16, 2021 seizure and that she had experienced numbness in the first three fingers of her left hand the day before this visit.

Dr. LeBlanc's September 2, 2021 office note indicates that Plaintiff was seen by an eye doctor and diagnosed with visual migraines. It was noted that she had last been seen in July and had suffered one seizure in May 2021. She had undergone an

12

EEG and an MRI, which were both unremarkable. She was not currently on anti-seizure medication. Dr. LeBlanc stated that the patient was unable to drive for six months after her seizure, but if she remained seizure free while off her medication, she could resume driving. Plaintiff was prescribed Topamax, an anticonvulsant medication, and scheduled to return in four weeks.

On November 22, 2021, Plaintiff returned to Dr. LeBlanc and advised that she had experienced a seizure, without loss of consciousness, approximately one month prior to this visit. She reported that she had stopped taking her Topamax due to having severe headaches, and she had not taken Keppra, another anticonvulsant medication, since her initial seizure. Dr. LeBlanc recommended that she restart the Keppra. He restricted her from driving and recommended that she continue working from home.

On January 5, 2022, Plaintiff returned to Dr. LeBlanc and requested a release to drive and to return to work as she had not experienced a seizure since she restarted the Keppra. Dr. LeBlanc's note stated that Plaintiff had suffered from seizure-like activity but she was now on Keppra and had no further issues. He released Plaintiff to return to work, but continued her driving restriction.

Once Plaintiff started taking her medication, she suffered no seizures from September 2021 until November 2, 2022, when she inhaled the gas fumes. During this time, Plaintiff was fully capable of performing her job duties as a medical assistant. NP Joseph opined that the gas had to have caused Plaintiff's seizure since Plaintiff had not had a seizure since September 2021, but had not suffered another seizure since September 2021 until her exposure to the gas.

NP Joseph testified that she began treating Plaintiff at the Rural Health Clinic on April 3, 2024. At that time, Plaintiff presented with left-sided weakness, abnormal

13

speech, and was dependent on a walker. Because the pain was so pronounced on her left side, Plaintiff was referred to Dr. Odenheimer for the performance of an EMG. NP Joseph last examined Plaintiff in March 2025. At that time, Plaintiff's speech had improved but she still suffered from left-sided weakness and was dependent on a cane. In NP Joseph's opinion, Plaintiff was on a "non-duty status."

In rejecting Plaintiff's claim, the WCJ stated:

> We have discrepancies in the testimony of Ms. Cormier with regard to having seizures versus not having seizures. There's at least a report of a seizure between her September visit of 2021 and November 22, 2021, a seizure since last visit; that would be her second seizure, then we have a third seizure on November 2nd, 2022, then we have a fourth potential seizure on November 4, 2022, and then we have another seizure June of 2023.

During the hearing, Plaintiff explained that to her knowledge, she had suffered only two seizures, on May 16, 2021, and on November 2, 2022. She reiterated that in both instances, she lost conscience and urinated on herself. Particularly, the November 2, 2022 seizure occurred when she got into her car to leave work. Plaintiff's husband, Kelyn Thierry, confirmed that Plaintiff was disoriented and had urinated on herself when she arrived home, which was how they knew that she had suffered a seizure.

Regarding whether she had experienced any seizures between September 2021 and November 22, 2022, Plaintiff explained that although she had suffered seizure-like symptoms, these symptoms were related to her anxiety. She stated that her doctors had ruled out that she had suffered seizures.

It should be noted that Dr. LeBlanc's January 5, 2022 report did provide that Plaintiff suffered from "seizure-like" activity but now on Keppra with no further issues. Likewise, regarding the WCJ's statement that Plaintiff had a seizure on November 4, 2022, Plaintiff denied this. This was in reference to a July 29, 2024

14

note by NP Joseph that Plaintiff had been seizure-free from November 4, 2022. NP Joseph testified that she was told Plaintiff suffered a seizure on November 2, 2022, when her husband found her listless in the garage. Additionally, the November 5, 2022 St. Patrick report provides that Plaintiff presented with a three-day history of progressive weakness affecting her left side. The report also noted that her past medical history was significant for "anxiety."

Finally, regarding the WCJ's statement that Plaintiff had another seizure in June 2023, Dr. LeBlanc's June 15, 2023 report stated that Plaintiff said, "she had another episode." However, the report goes on to state that Plaintiff had a panic attack, and it was recommended that she undergo a psychological examination to rule out a conversion disorder.[6]

To establish that her current condition was caused by her exposure to gas fumes, Plaintiff submitted the deposition testimony Dr. Odenheimer, who performed her October 9, 2024 EMG. This test revealed nerve damage on Plaintiff's left side. Because Dr. Odenheimer noticed a neurologic condition that he felt he could treat, he began seeing Plaintiff on October 24, 2024. At that time, he noted that Plaintiff presented with left hemisensory motor complaints that affected her face, left arm, and left leg and that her left leg was shaking. His note stated that Plaintiff's left-sensory motor complaints had been ongoing for two years and were related to her inhalation of gas fumes at work in November 2022. The note further stated that Plaintiff experienced a seizure on exposure to the gas.

---

[6] "A conversion disorder, also called functional neurological symptom disorder, is a relatively uncommon mental disorder. Typically the person has physical symptoms that cannot be explained by a thorough diagnostic evaluation." Howard E. LeWine, MD, *Conversion disorder (functional neurological symptom disorder)*, Harvard Health Publishing (Jan. 30, 2026), https://www.health.harvard.edu/a_to_/conversion-disorder-functional-neurological-symptom disorder-a-to-z.

Dr. Odenheimer's diagnosis included left non-dominant hemiparesis, left hemisensory disturbances, dystonia, dystonia tremor, movement disorder, adjustment disorder, and chemical exposure. In his opinion, Plaintiff's symptoms were related to her inhalation of fumes in November 2022. He stated, "History would suggest she was exposed to a toxin and, after that, developed a variety of symptoms she didn't have before it." Dr. Odenheimer further testified, "I believe that I can say with reasonable degree of certainty, or the phrase I understand we're looking for, is more probable than not that she has a constellation of symptoms that began with an event that took place at work."

In rejecting Dr. Odenheimer's opinion, the WCJ stated:

With regard to Dr. Odenheimer, he said, "the event was a seizure, not -- not toxin exposure causing the seizures", Page 37 of his depo.

Dr. Odenheimer's causal connection opinion, however, is flawed due [to] his knowledge and history of the patient's seizures being incorrectly logged also. Dr. Odenheimer thought Ms. Cormier had only had one prior seizure, which is not correct according to the medical records. The Court has counted at least four seizures and maybe five, but Dr. Odenheimer on Page[s] 39 and 40 said it was idiopathic and it was only one seizure.

Dr. Odenheimer did not state that the event was a seizure as asserted by the WCJ. To the contrary, Dr. Odenheimer's deposition testimony provided:

Q.   Is this event a seizure, or why are we calling it an event? Can you explain that for me?

A.   Something happened. That's an event.

Q.   Okay. Would you say it was a seizure?

A.   Somewhere along the line, she had a seizure.

Q.   Okay. Is that the event that you're referencing?

A.   No. The event was the toxin exposure.

16

Q.     Okay. Is it your opinion that the exposure to a toxin caused her to have a seizure?

A.     Probably.

It is clear that the WCJ was of the opinion that Plaintiff's condition was the result of her having a seizure. In his oral ruling, the WCJ stated:

> I think that Brandon Davis and Dr. Laborde said there was no objective evidence of any gas exposure that would have caused the carbo-oxyhemoglobin level on her blood, so there wasn't a deprivation of oxygen. There was no objective evidence of anything other than an epileptic seizure that evening after she returned to her house.
>
> There wasn't any testimony from any medical provider that really elicited or demonstrated that the smell triggered the seizure for Ms. Cormier.

Dr. Odenheimer explained that a stroke is caused by a lack of oxygen to part of the brain, which results in tissue death or hemorrhage,[7] whereas a seizure is a transient, temporary, electrical phenomena, which affects the brain and can cause a wide variety of symptoms. A person predisposed to seizures is more likely to experience such when subjected to stressors or a derangement in chemistry than a person with no such history. However, Dr. Odenheimer clarified that Plaintiff's current condition was not caused by a seizure, but, instead, was the result of her being neurologically compromised by the inhalation of gas or toxins while at work. Dr. Odenheimer's testimony in this regard provided:

> Q.     So can you say to a reasonable degree of certainty, knowing what you know now, that her symptoms are due to inhaling a substance on November 2nd of 2022, as opposed to it being an idiopathic seizure or a seizure as a result of medications?
>
> A.     I am lumping her globally, and her second seizure is the least of my concerns. Still isn't clear that she would need medication for seizures. She's now had two. That isn't why I felt she would benefit from neurologic consultation, evaluation, and treatment. And seizures, you know, yeah, it - - was part of the picture, but

---

[7] Dr. Odenheimer stated that the MRI findings ruled out that Plaintiff suffered a stroke.

that's the least of my concerns. And if we ever need to address it, I'll treat it. And it's academic to me whether chemical exposure facilitated her next one or enhanced the likelihood of future seizures. That's a - - a non-issue. The issue is she's neurologically compromised whether she had seizures or not. And it was evident just looking at her without hearing any of her history that she had problems that might be treatable.

Dr. Odenheimer stated that toxins can cause nerve damage, and natural gas is a toxin.[8] His opinion that Plaintiff's neurological symptoms were not the result of a seizure is reinforced by Dr. Laborde, who testified that when Plaintiff returned to St. Patrick on November 5, 2022, her complaints had changed from general weakness to one-sided weakness. At the time, Dr. Laborde felt that this was associated with Todd's paralysis, which is a complication of a seizure that is transient, with the patient regaining functionality a day or two later. However, this is not what happened to Plaintiff as she continues to suffer neurologic symptoms years after her exposure at work. Dr. Odenheimer's opinion that Plaintiff's condition resulted from her exposure to gas rather than from seizures was essentially uncontradicted.

In *Brown v. Town of Ferriday*, 11-570, pp. 2–3 (La.App. 3 Cir. 11/2/11), 76 So.3d 155, 157–58 (alteration in original), this court explained:

The claimant in a workers' compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. *Quinn v. Vidalia Apparel*, 10-712 (La.App. 3 Cir. 12/8/10), 54 So.3d 123. A panel of this court recently reiterated the presumption of causation applicable in workers' compensation cases, stating:

"An employee in a worker[s'] compensation action has the burden of establishing a causal link between the work-related accident and the subsequent disabling condition." *Miller v. Roger Miller Sand, Inc.*, 94-1151, p. 6 (La.11/30/94), 646 So.2d 330, 334. An employee's disability is presumed to have resulted from the accident if before the accident, the injured employee was in good health, but commencing with the accident, symptoms of the disabling condition appeared and continuously

---

[8] Dr. Shamieh felt Plaintiff was suffering from post-chemical exposure.

18

manifested themselves afterwards. *Walton v. Normandy Village Homes Ass'n, Inc.*, 475 So.2d 320 (La.1985). However, the presumption requires either that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and disabling condition, or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection. *Id.*

*Richard v. Vermilion Hosp.*, 10-385, pp. 4–5 (La.App. 3 Cir. 6/9/10), 41 So.3d 1219, 1223 (quoting *Marks v. 84 Lumber Co.*, 06-358 (La.App. 3 Cir. 9/27/06), 939 So.2d 723 (alteration in original)), *writ denied*, 10-1611 (La.10/8/10), 46 So.3d 1269.[2]

Whether the presumption is applicable is a finding of fact subject to the manifest error-clearly wrong standard of review. *Littleton v. Richardson Med. Ctr.*, 42,082 (La.App. 2 Cir. 4/4/07), 954 So.2d 812 (citing *Detraz v. Lee*, 05-1263 (La. 1/17/07), 950 So.2d 557). However, the manifest error standard no longer applies where the trial court makes one or more legal errors which interdict the fact-finding process. *Evans v. Lungrin*, 97-541, 97-577 (La.2/6/98), 708 So.2d 731. In that case, the appellate court must, if it can, make an independent *de novo* review of the record and render judgment. *Id.*

[2] This presumption has become known as the *"Housley* presumption." In *Housley v. Cerise*, 579 So.2d 973 (La.1991), the supreme court held that a plaintiff's disability is presumed to have come from an accident where: 1) the plaintiff was in good health before the accident; 2) the symptoms of the plaintiff's alleged injury appeared and continuously manifested themselves after the accident; and 3) the plaintiff submits evidence, whether medical, circumstantial, or common knowledge, that demonstrates a reasonable possibility of causation between the accident and the alleged injury. Although *Housley* addresses the presumption of causation as it applies to nonworkers' compensation civil cases, the presumption "has its root in workers' compensation cases dating to 1917." *Detraz v. Lee*, 05-1263 (La.1/17/07), 950 So.2d 557.

In *Barber Brothers*, 873 So.2d 677, the claimant asserted that his respiratory, sinus, and dermatitis conditions occurred in the course and scope of his employment from his exposure to asphalt fumes. In upholding the WCJ's award of indemnity and medical benefits, the court stated:

Once the employee has established the presumption of causation, the opposing party bears the burden of producing evidence to prove that

it is more probable than not that the work injury did not accelerate, aggravate, or combine with the pre-existing injury to produce his disability. *Preveto* [*v. WHC Contractors*], 93-1402, pp. 2–3 [(La. 1/14/94)], 630 So.2d [689,] 691. Medical testimony, albeit significant, is not conclusive as to the issue of causation, which is generally the ultimate fact to be decided by the court after weighing all the evidence. *Id.*

*Id.* at 681.

We find that the WCJ committed manifest error in holding that Plaintiff failed to establish a causative link between her inhalation of gas fumes and her condition as evidenced by his statement that he "didn't have any testimony to say that the smell triggered a pre-existing seizure disorder[,]" and "[i]f I had that, I would have related the seizure to the smell[.]" The WCJ incorrectly focused on a seizure, or seizures, as the necessary causative factor for Plaintiff's condition, rather than the exposure to a toxin, the natural gas in this case. This is also evident by the WCJ's statement that "[t]here wasn't any testimony from any medical provider that really elicited or demonstrated that the smell triggered the seizure[.]" While this may be true, it is not the focus of the issue, as clearly stated by Dr. Odenheimer. Plaintiff suffered no neurological effects from her May 2021 seizure. Both Dr. Odenheimer and Dr. Laborde testified that any neurological symptoms from a seizure would be of short duration. The neurological impairments here are long term.

A review of the evidence in this matter clearly establishes that Plaintiff was exposed to gas fumes or toxins while in the course and scope of her employment and that this exposure resulted in neurological damage that continues to affect her face, left arm, and left leg. Dr. Odenheimer testified without equivocation that Plaintiff's symptoms and disability were caused by her exposure to gas and not by any seizure activity. Not only was Plaintiff affected, but the evidence established that a co-worker was also affected by the gas fumes.

20

Prior to this exposure, Plaintiff was fully capable of completing all of her job duties at SWLA; however, following this exposure, she is not.[9] She is, therefore, entitled to the *Housley* presumption that her disability resulted from her exposure at work on November 2, 2022. As such, Plaintiff is entitled to temporary total disability benefits during her period of disability. La.R.S. 23:1221(1)(a). Based on Plaintiff's wage records, her average weekly wage was $775.68, with a corresponding compensation rate of $517.38. Accordingly, we award Plaintiff $95,818.78 in temporary total disability benefits for the period between November 3, 2022, through May 22, 2026. We further award her future temporary total disability benefits at the rate of $517.38 per week until she is no longer entitled to such benefits pursuant to La.R.S. 23:1221(1)(d). Said compensation benefits to bear judicial interest from the date compensation was due until the date of satisfaction pursuant to La.R.S. 23:1201.3(A).

Plaintiff is also entitled to all necessary medical treatment. In *Figgins v. Wal-Mart*, 06-806, p. 4 (La.App. 3 Cir. 11/15/06), 945 So.2d 153, 156–57, *writ denied*, 06-2977 (La. 2/16/07), 949 So.2d 421, this court stated:

> Louisiana Revised Statute 23:1203(A) mandates that an employer provide an injured employee with all necessary medical treatment. To establish a claim for medical benefits, the employee must show to a reasonable certainty and by a preponderance of the evidence, that the benefits are occasioned by the work-related accident and are necessary. *Alleman v. Fruit of the Loom–Crowley*, 96-1246 (La.App. 3 Cir. 3/5/97), 692 So.2d 485.

Further, the supreme court in *Authement v. Shappert Engineering*, 02-1631, p. 11 (La. 2/25/03), 840 So.2d 1181, 1188, explained:

> The workers' compensation scheme was not designed for the worker to pay the costs of his medical treatment. It is the obligation of

---

[9] Dr. LeBlanc, Dr. Odenheimer, and NP Joseph all indicated that Plaintiff was currently incapable of working.

21

the employer to pay for the cost of medical services, not the obligation of the employee. The employee should not be denied treatment because a controversy exists as to who will advance costs so that treatment will be rendered.

As will be discussed more fully below, Defendants denied this claim from the onset without a proper investigation, forcing Plaintiff to obtain her own funding for her medical treatment. In addressing a similar situation, this court, in *Smith v. Roy O. Martin Lumber Co.*, 03-1441, p. 8 (La.App. 3 Cir. 4/14/04), 871 So.2d 661, 667–68, *writ denied*, 04-1311 (La. 9/24/04), 882 So.2d 1144, stated:

> Martco also argues the WCJ erred in ruling it could not apply the fee schedule of La.R.S. 23:1034.2 "because the employer denied the claim from the very beginning." Since Martco denied the claim from the onset, Smith was forced to fund the costs of medical treatment himself, either through insurance or from the Veteran's Administration Hospital. La.R.S. 23:1142(E) provides in the "event that the payor has denied that the employee's injury is compensable under this Chapter, then no approval from the payor is required prior to the provisions of any diagnostic testing or treatment for that injury." We agree with the WCJ that the employer is not entitled to rely on the fee schedule benefits after making a total denial of the claim and forcing the claimant to seek medical treatment unilaterally. *See Barron v. First Lake Properties, Inc.,* 93-902 (La.App. 5 Cir. 3/29/94), 636 So.2d 970, 973 (noting if a "claim is found to be valid by the insurer or the court, the employer will be liable for those expenses under La.R.S. 23:1202 as well as La.R.S. 23:1142(D). If it's not compensable, the employer will not be held liable for them.").

At trial, Plaintiff submitted a list of medical expenses she incurred as a result of her injury, totaling $118,418.71. Defendant is obligated to pay these expenses without benefit of the Office of Workers' Compensation Medical Reimbursement Schedule. Defendant is further obligated to pay all future necessary medical expenses incurred by Plaintiff related to her injury as provided in the Medical Reimbursement Schedule. La.Admin.Code. tit. 40, Pt. I, § 5157.

22

*The trial court's acceptance of Dr. Segura's opinion letter.*

Plaintiff assigned as error the WCJ's acceptance of Defendant's uncertified second-medical-opinion letter by Dr. Enrique Segura, a neurologist. At the time the letter was introduced, Plaintiff objected to its acceptance because it was uncertified and was submitted after the deadline for submitting exhibits. Although the WCJ accepted the letter, he stated during his ruling that he did not review it in reaching his decision. In that the letter was not reviewed by the WCJ, we consider this assignment of error moot.

*The trial court's failure to award penalties and attorney fees.*

Plaintiff asserts that she is entitled to both penalties and attorney fees due to Defendants' failure to adequately investigate and pay her workers' compensation claim. As the WCJ denied Plaintiff's claim for benefits, it did not reach the issue of penalties and attorney fees. Louisiana Code of Civil Procedure Article 2164 authorizes this court to "render any judgment which is just, legal, and proper upon the record on appeal." We find the record such that we can address the issue here.

In *Brown v. Texas-LA Cartage, Inc.*, 98-1063, pp. 8–10 (La. 12/1/98), 721 So.2d 885, 890–91 (alteration in original) (footnote omitted), the supreme court discussed the award of penalties and attorney fees based on the employer's failure to reasonably controvert the employee's workers' compensation claim:

> The unambiguous language of La. R.S. 23:1201 clearly establishes that penalties and attorney fees for failure to timely pay benefits shall be assessed unless the claim is reasonably controverted or such nonpayment results from conditions over which the employer or insurer had no control. Unreasonably controverting a claim, which is the exception at issue in this case, requires action of a less egregious nature than that required for arbitrary and capricious behavior. Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. BLACK'S LAW DICTIONARY 104, 211 (6[th] ed.1990). Stated another way, such behavior

23

arises from unrestrained exercise of the will or personal preference or lacks a predictable pattern. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 110, 333 (1966).

The phrase "reasonably controverted," on the other hand, mandates a different standard. In general, one can surmise from the plain meaning of the words making up the phrase "reasonably controvert" that in order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits. Thus, to determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La. R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed. This definition is in accord with that presently used by the lower courts to determine whether penalties and attorney fees are owed. *See Antrainer v. Great Atlantic & Pacific Tea Co.*, 97-1554, p. 6 (La.App. 1 Cir. 4/8/98), 712 So.2d 590, 594 ("Given the facts, medical and otherwise, known to the employer or his insurer, did the employer or insurer have a reasonable basis to believe that medical expenses and compensation benefits were not due the employee."); *Woods v. Ryan Chevrolet, Inc.*, 30,206, p. 9 (La.App. 2 Cir. 2/25/98), 709 So.2d 251, 257 ("The employee's right to such benefits will be deemed 'reasonably controverted' if the employer or insurer had a reasonable basis for believing that medical expenses and indemnity benefits were not due the employee. . . . Reasonably controverting a claim means that the payor has factual or medical information of such a nature that it reasonably counters that provided by the claimant."); *Cook v. Kaldi's Coffee House*, 97-0979, p. 10 (La.App. 4 Cir. 1/28/98), 706 So.2d 1052, 1058 ("The test to determine whether the claimant's right has been reasonably controverted turns on whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant."); *Lemoine v. Hessmer Nursing Home*, 94-836, p. 20 (La.App. 3 Cir. 3/1/95), 651 So.2d 444, 456 ("A workers' compensation claim is 'reasonably controverted,' precluding imposition of penalties and attorney fees, if the employer had sufficient factual and medical information upon which to base a decision to reduce or terminate benefits."). If an employer or insurer reasonably controverts a claim and then becomes aware of information that makes his controversion of that claim unreasonable, he must then pay the benefits owed or be subject to penalties and attorney fees from that point forward.

The case at hand, though involving a different work-related incident and injury, is similar to that reviewed by this court in *Broussard v. Dacon Corp.*, 96-

24

1615 (La.App. 3 Cir. 4/2/97), 692 So.2d 1325, where we determined that the employee's unusual working conditions were the cause of his atrial fibrillation. There, like here, the WCJ did not reach the issue of entitlement to penalties and attorney fees since she dismissed the employee's claim as not compensable. On review, after finding the employee's claim compensable, we stated:

> It is settled that a workers' compensation claimant is entitled to penalties and attorney's fees if benefits are withheld or terminated arbitrarily, capriciously, or without reasonable cause by the employer. La.R.S. 23:1201 & La.R.S. 23:1201.2; *Faul v. Bonin*, 95-1236 (La.App. 3 Cir. 8/7/96); 678 So.2d 627, *writ denied*, 96-2221 (La.11/15/96); 682 So.2d 769. "The test to determine if the employer has fulfilled its duty is whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant." *Id.*, at 632. This court has also held that an employer or insurer "who fails to investigate an employee's compensation claim subjects itself to statutory penalties and attorney's fees." *Laneaux v. Opelousas Artificial Kidney Center*, 93-1264 (La.App. 3 Cir. 6/1/94); 640 So.2d 701, *writ denied*, 94-1794 (La.10/14/94); 643 So.2d 163.

*Id.* at 1329.

In *Brousard*, we examined the scant notes of the insurer's field representative and held that penalties and attorney fees were appropriate based on the insurer's failure to adequately investigate the claim:

> The record does not contain the typed statement referred to by the Liberty Mutual representative. However, the record does contain a handwritten "Illness Preliminary Report" completed by Dacon's Project Manager, Bud Cummings, on the date of the illness, September 25, 1995. In this report, Cummings stated that Broussard became ill on the job and was eventually driven to the emergency room. Cummings further explained that the doctors, having diagnosed a heart flutter, opined that the flutter "could be brought on by a number of things." It was perhaps this statement that prompted the stance taken by the insurer. Perhaps this statement indicated the need for investigation, but it certainly was not a basis for withholding benefits.
>
> Although Cummings clearly suffered his injury while in the course and scope of his employment, Dacon failed to investigate the claim or even contact Broussard's doctors as to the possible causes. Dacon had knowledge of the injury in September 1995 and received

25

medical bills from Broussard beginning in November 1995. Yet, it was not until February 1996 that Dacon interviewed Dr. Yamada. We conclude that Dacon's failure to pay benefits, without any investigation, and without anything more than a speculative basis for withholding benefits, was arbitrary, capricious, and unreasonable. We, therefore, find that penalties and attorney's fees are appropriate in this case.

*Id.* at 1329–30.

During the trial in the case at hand, the adjuster's notes were entered into evidence by Plaintiff to establish the lack of a valid investigation undertaken by the adjuster. The notes simply indicated that the claim was "not questionable." The notes further provided:

Spoke with our insd. Insd was driving to the LC site. The [accident] was reported late because it just made it to the HR office. Apparently, the [injured worker] had a seizure due to inhaling [f]umes at the work site the day before. Insd will send me all documents and timeline from direct supervisor via email.

There is nothing else in the notes reflecting any further evaluation of the claim by the adjuster and according to Defendants' response to Plaintiff's interrogatories, no one other than the adjuster investigated this claim. Defendants, in their brief, assert that their investigation included "uncovering Cormier's epileptic condition via obtaining prior medical records, ultimately contributing to the claim denial." A review of the medical records indicates that Dr. LeBlanc's records were certified on February 15, 2023, and those of the other healthcare providers were not certified until March 2023. Therefore, these records were not received by Defendants until months after Plaintiff's exposure, and there is no record of Defendants contacting any medical expert regarding causation in this matter. While Defendants did have Plaintiff examined by Dr. Segura, this was not done until May 16, 2025.

Based on our review, we find that Defendants did not possess "sufficient factual [or] medical information to reasonably" controvert Plaintiff's claim when it

26

was denied. *See Brown*, 721 So.2d at 891. Thus, Plaintiff is entitled to penalties and attorney fees.

Unless "reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control[,]" the failure to pay benefits due "shall result in the assessment of" penalties and attorney fees. La.R.S. 23:1201(F)(2). The penalties assessed shall be "in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld[.]" La.R.S. 23:1201(F). "[H]owever, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim[,]" and "[t]he maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars." *Id.*

Here, Plaintiff asserts that a penalty of $8,000.00 is required as Defendants have failed to pay indemnity benefits and medical expenses since the accident. We agree and assess penalties at $8,000.00. Defendants did not set forth any argument to counter this claim, relying, instead, solely on its defense of the occurrence of the accident and causation.

We also find that an award of attorney fees is warranted. "Some of the factors taken into account by the judge in fixing the amount of the fee are the degree of skill and ability exercised by the attorney, the amount of the claim, the amount recovered for the employee, and the amount of time the attorney devoted to the case." *McCarroll v. Airport Shuttle, Inc.*, 00-1123, p. 9 (La. 11/28/00), 773 So.2d 694, 700. Introduced into evidence at trial were the detailed billing records of Plaintiff's

27

counsel, evidencing a total of 92.2 hours expended in the representation of Plaintiff for work performed through trial. That evidence was not controverted.

In *Cox, Cox, Filo, Camel & Wilson, LLC v. Louisiana Workers' Compensation Corp.*, 21-566, p. 13 (La. 3/25/22), 338 So.3d 1148, 1158, the supreme court found that an award of $300.00 per hour for a total of 68.5 hours, amounting to $20,550.00, was a "reasonable" attorney fee for defending the Cox law firm against the workers' compensation claim filed by its employee. Thus, we use that hourly benchmark and fix attorney fees herein at $27,660.00.

*Attorney fees for work performed on appeal.*

Plaintiff has requested an additional award of attorney fees for work performed on appeal. "It is within the appellate court's discretion to award or increase attorney's fees for appellate work." *Chandler v. Ouachita Par. Sheriff's Off.*, 48,179, p. 15 (La.App. 2 Cir. 8/7/13), 121 So.3d 1216, 1226. Given that Plaintiff has successfully reversed the WCJ's judgment and has obtained judgment awarding her indemnity benefits and medical benefits as well as penalties and attorney fees pursuant to La.R.S. 23:1201(F), we award her an additional $7,500.00 in attorney fees for work performed in conjunction with this appeal.

### DECREE

For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered in favor of Plaintiff, awarding her temporary total disability benefits in the amount of $95,818.78, for the period of time between November 3, 2022–May 22, 2026, and future temporary total disability benefits continuing during the period of Plaintiff's disability based on her compensation rate of $517.38 per week. Said compensation benefits to bear judicial interest from the date compensation was due until the date of satisfaction pursuant to La.R.S.

28

23:1201.3(A). Judgment is rendered in favor of Plaintiff, ordering Defendants to pay all medical expenses incurred by Plaintiff, from the date of her injury through the date of trial, in the amount of $118,418.71. Defendants are further ordered to pay all necessary future medical expenses incurred by Plaintiff pursuant to the Medical Reimbursement Schedule. Judgment is further rendered in favor of Plaintiff, awarding her penalties in the amount of $8,000.00; attorney fees in the amount of $27,660.00; additional attorney fees for work done on appeal in the amount of $7,500.00; and all costs associated with this trial, including all expert witness and deposition costs. All costs of this appeal are assessed to SWLA Center for Health Services and Louisiana Workers' Compensation Corporation.

**REVERSED AND RENDERED.**

29